**Andrew A. Bao, Esq.**
**Nevada State Bar No. 10508**
*abao@abao.law*
**Andrew Bao & Associates**
**8020 S. Rainbow Blvd, Suite 100-163**
**Las Vegas, Nevada 89139**
**Tel: (725) 204-9579**

**Attorneys for Plaintiff**
**Dakota Delance**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DAKOTA DELANCE,<br><br>          Plaintiff,<br><br>  v.<br><br>UNION HOME MORTGAGE CORP., a Ohio Corporation; SN SERVICING CORPORATION, an Alaskan Corporation; U.S. BANK TRUST, N.A., AS TRUSTEE FOR LB-DWELLING SERIES VI TRUST, a trust entity, and DOES 1 through 10, Inclusive,<br><br>          Defendants. | Case No.:<br><br>**COMPLAINT**<br><br>**[JURY DEMANDED]** |

COMES NOW, Plaintiff Dakota Delance ("Plaintiff"), by and through his counsel of record, who hereby files this Complaint and alleges as follows:

### PARTIES AND JURISDICTION

1.    The parcel of real property at issue is commonly known as 4701 E. Savoy Blvd., Pahrump, NV 89061, Assessor's Parcel Number 045-293-10 ("Property").

2.    Plaintiff is an individual residing in the State of Nevada.

3.    Plaintiff is informed and alleges that Defendant Union Home Mortgage, Corp. ("UHM") is a foreign corporation organized under the laws of Ohio and conducting business in Nye County, Nevada.

4.    Plaintiff is informed and alleges that Defendant SN Servicing Corporation ("SN Servicing") is a foreign corporation organized under the laws of Alaska and conducting business in

Nye County, Nevada.

5.       Plaintiff is informed and alleges that Defendant U.S. Bank Trust, N.A., as Trustee for LB-Dwelling Series VI Trust ("U.S. Bank") is a trust entity organized under the laws of the United States and qualified to do business in Nye County, Nevada.

6.       Defendants UHM, SN Servicing and U.S. Bank (collectively referred to as "Defendants"), at all relevant times, and each of them, were the principals, employers, associates, co-venturers, agents and/or employees of one another and were acting within the purpose and scope of their agency and employment.  Each Defendant has ratified and approved the acts of its agents and, at all material times, each Defendant was responsible in some manner for the acts and conduct alleged in this Complaint.

7.       Plaintiff is ignorant of the true names and capacities, whether corporate, individual, or otherwise, of the other defendants, and therefore sues those defendants herein as DOES I through X, inclusive.  When Plaintiff ascertains the identities and exact nature of such fictitious defendants, it will seek leave of this Court to amend this Complaint to assert the true names thereupon.

8.       This Court has general subject matter jurisdiction as there is diversity of citizenship between Plaintiff and all Defendants and the amount in controversy exceeds $75,000.00. Furthermore, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1367(a).

9.       The acts and omissions complained of herein pertain to the Property which is located in Nye County and falls within the jurisdiction of this Court.

10.       Venue is proper because the Property is located and the transactions at issue were conducted in Nye County, Nevada.

## GENERAL ALLEGATIONS

### A.       Background Facts

11.       Sometime in September 2020, Plaintiff purchased the Property. At that time, it was a parcel of vacant land.  The plan was to build a residence for himself and his family on the land.

12.       On or about December 30, 2020, Plaintiff was a co-borrower of a construction loan. The lender of the construction loan was UHM and the principal balance was $348,000.00.  The construction loan consisted of a promissory note and deed of trust, attached hereto as **Exhibits 1 and**

**2**, respectively.

13.     Sometime in July 2021, construction of the residence at the Property was completed.

14.     In November 2021, Plaintiff moved his family into the Property and has been his principal residence since this time.

15.     On or about December 7, 2021, a Construction Conversion Modification Agreement was recorded to reflect that the construction was completed on the Property and to convert the terms of the Note and Deed of Trust to reflect this completion.  See **Exhibit 3** hereto (Note, Deed of Trust, Construction Conversion Modification Agreement ("**Exhibits 1-3**") are hereby attached hereto referred to as "Loan").

16.     After finishing construction of the home in July 2021 and before recording the Construction Conversion Modification Agreement in December 2021, UHM advised Plaintiff that he did not qualify for the Loan.

17.     Despite knowledge of this, UHM pushed the Loan through and in doing so, required Plaintiff to pay additional mortgage insurance.

18.     UHM's questionable tactics in 2021 to qualify Plaintiff for a Loan he could not afford pale in comparison to the issues alleged in this lawsuit.

**B.     UHM Offers a Loan Modification to Plaintiff in December 2024; Plaintiff Performs his Obligations**

19.     Plaintiff was current on his mortgage through the beginning of 2024.

20.     In early 2024, Plaintiff and his family began to suffer difficult financial circumstances.

21.     Beginning January 2024, UHM agreed to a forbearance plan with Plaintiff.

22.     Sometime in late summer 2024 or fall 2024, UHM offered Plaintiff a loan modification agreement.

23.     In order to qualify for the modification, UHM instructs Plaintiff to make three (3) trial payments.

24.     Plaintiff timely made all three (3) trial payments by December 2024.

///

C.    **UHM Fails to Offer a Loan Modification to Plaintiff After Receiving Plaintiff's Trial Payments**

25.    Beginning December 2024, Plaintiff begins speaking with an individual named "Amber Edmonson" at UHM.

26.    In December 2024, Amber informs Plaintiff that he qualifies for a loan modification and that she was running the "final numbers" to send the loan modification agreement to Plaintiff.

27.    In January 2025, Plaintiff contacts Amber repeatedly to attempt to finalize the modification so he can make payments from December 2024 moving forward.

28.    Approximately 6-7 weeks go by without any modification agreement being received.

29.    Finally on January 24, 2025, Amber contacts Plaintiff to advise, in writing, that the servicing of the Loan is being transferred as of February 18, 2025, and that "the new servicer will honor your modification and get the modification documents prepared."

30.    Amber, nor anyone else at UHM, provides the identity of the new servicer or when the modification agreement would be received.

31.    At this point, Plaintiff owes the December 2024 and January 2025 mortgage payments.

32.    Despite not having any modification in place, he relies on UHM's statements (through Amber) that "the new servicer will honor your modification and get the modification documents prepared."

D.    **There is no New Servicer and No Modification Agreement.**

33.    On February 25, 2025, Amber again advises Plaintiff, in writing, that the new servicer would send the modification agreement to Plaintiff.

34.    Then, on March 4, 2025, Amber advises Plaintiff, in writing, of exactly the opposite - that UHM would now send the modification agreement.

35.    During these communications in late February 2025 / March 2025, at one point Amber advises Plaintiff that the February payment must be made.

36.    By early March 2025, Plaintiff was extremely confused by UHM's various inconsistent statements.

37.     Despite qualifying for a modification agreement in December 2024 after making three (3) trial payments, as of early March 2025 (4 months later) UHM has still not advised Plaintiff who is actually servicing the Loan, who he owed payments to, what month he owed, and why a modification agreement was still not received.

38.     On March 25, 2025, Plaintiff emails Amber to express this confusion and to request clarification of his obligations.

39.     On the same day, Amber responds on behalf of UHM, in writing, that the modification would be honored and that she would send the modification agreement to Plaintiff once the February and March 2025 payments are paid.

40.     This was again extremely confusing to Plaintiff, as Plaintiff still owed the payments for December 2024 and January 2025.  In February, Amber had also advised him that rather than pay for December 2024 and January 2025, the February 2025 payment was owed.  On March 25, 2025, Amber now began advising Plaintiff that now February and March were owed.

41.     To add to the confusion, Plaintiff has yet to receive a modification agreement telling him what the monthly payment was or what month was owed.

**E.     UHM Sends the Modification Agreement to Plaintiff and Then Fails to Abide by Its Terms**

42.     On or about March 26, 2025, Amber advises Plaintiff that UHM sent the modification agreement to Plaintiff.  A true and correct copy of the modification agreement along with the cover letter is attached hereto as **Exhibit 4.**

43.     On April 4, 2025, Plaintiff reviews the modification and contacts Amber. Specifically, Plaintiff asks questions about the  missing payments on the Loan (December 2024 and January 2025) and why the modification documents reflect UHM as the servicer rather than the new servicer who allegedly took over the Loan on February 18, 2025.

44.     By this time, Plaintiff was extremely worried, stressed and did not know what to do. Plaintiff beings to look for legal assistance because he still did not know who his servicer was, who he needs to make payments to and whether the modification (**Exhibit 4)** was an accurate document because its terms were inconsistent with Amber's prior representations.

45. Out of an abundance of caution, in mid April 2025, Plaintiff makes the February 1, 2025, payment pursuant to the modification agreement (**Exhibit 4**) to UHM despite not knowing of if the modification agreement (**Exhibit 4**) was valid.

46. In early May 2025, Amber then sends Plaintiff a text message to "send back" the March 26, 2025, modification agreement so that she could process the modification before the loan was service transferred.

47. However, instead of crediting Plaintiff for the February 1, 2025, payment, Amber advises Plaintiff in the same text message that the "March payment" had been received.

48. Again, Amber's statements, on behalf of UHM, were completely at odds with the modification agreement terms (**Exhibit 4**) and the payment that he made to UHM pursuant to the terms of the modification.

49. At this point, UHM has failed to abide by the terms of the modification agreement that was offered to Plaintiff.

**F.**    **The Loan Servicing Transfers to SN Servicing on May 6, 2025; SN Servicing Asserts the Modification Never Existed.**

50. To add to the confusion, UHM sent a letter to Plaintiff on April 16, 2025, weeks before Amber sent the May 2025 text messages to Plaintiff (See paragraphs 46 and 47), that the servicing would transfer to "SN Servicing Corporation" as of May 6, 2025.

51. This is the first time UHM has ever disclosed the identity of the new servicer that Amber advised Plaintiff back on February 18, 2025.

52. To make matters worse, SN Servicing denied the modification even exists.

53. This is despite UHM stating on January 24, 2025, and March 25, 2025, in writing to Plaintiff, that the "new servicer would honor the modification and prepare the documents."

54. As of June 22, 2025, Plaintiff had paid the three (3) trial payments and a February 2025 payment pursuant to the modification agreement (**Exhibit 4**).

55. On or about June 22, 2025, SN Servicing instead sends a demand to Plaintiff for $43,409.49 or risk facing foreclosure.

56. For months thereafter, Plaintiff's counsel attempted to rectify this problem with SN

1  Servicing and to have them honor the modification agreement (**Exhibit 4**).

2  57.    Instead of attempting to resolve the matter, in October 2025, SN Servicing expressly

3  repudiated the existence any modification offered to Plaintiff or even the January 2024 forbearance

4  agreement that UHM provided to Plaintiff.

5  58.    Instead, SN Servicing asserted that the Loan was due and owing for January 2024

6  (Plaintiff qualified for the modification in December 2024).

7  59.    On December 15, 2025, SN Servicing recorded a Notice of Default to begin

8  foreclosure proceedings.

9  60.    On December 19, 2025, less than one week from Christmas, SN Servicing posted the

10  Notice of Default on the front door of the Property, causing tremendous stress for Plaintiff and his

11  family during the holidays.

12  61.    Despite Plaintiff's increasingly frantic requests for a resolution to the matter, UHM

13  continued to tell him that a modification would be forthcoming either by UHM or by the new

14  servicer.  Even though a modification was sent in March 2025 and Plaintiff made a payment under

15  the modification (**Exhibit 4**), approximately six weeks later SN Servicing repudiated the existence of

16  the modification.

17  62.    Plaintiff struggled for more than one year in tireless and desperate attempts for UHM

18  to make good on its promise to provide a modification in December 2024 after Plaintiff qualified for

19  such.

20  63.    At some point during this process, SN Servicing has advised Plaintiff that U.S. Bank

21  is the owner of the Loan.

22  58.    As a result of Defendants' actions against Plaintiff, Plaintiff has been compelled to

23  seek redress in a court of law and has incurred attorney's fees and costs.

24  **FIRST CLAIM FOR RELIEF**

25  **(Breach of Contract – Against Defendants)**

26  59.    Plaintiff repeats, re-alleges, and incorporates herein by reference the allegations set

27  forth in the preceding paragraphs.

28  60.    As set forth in the general allegations, Plaintiff and Defendants entered into a binding

and enforceable contract: once Plaintiff made 3 trial payments, he would be given a modification of the Loan in December 2024.

61.     This modification would amend and/or modify the terms of the Loan.

62.     U.S. Bank is the owner of the Loan.  UHM was the servicer of the Loan through May 6, 2025, when SN Servicing became the current servicer of the Loan on U.S. Bank's behalf.

63.     Plaintiff performed all of his obligations to receive a December 2024 modification; i.e., he made the required three (3) trial payments to UHM.

64.      Although there were attempts to finalize the modification (**Exhibit 4),** as pled herein UHM's actions and conduct are in breach of and/or was an anticipatory repudiation of the modification that Plaintiff was to receive in December 2024.

65.     SN Servicing repudiated the existence of the modification that Plaintiff was to receive in December 2024 after becoming the servicer of the Loan.

66.     Plaintiff is legally excused from continuing to make payments under the December 2024 modification given that UHM and/or SN Servicing, acting at all times on behalf U.S. Bank, repudiated the offer to modify the Loan and/or refused to perform their obligations by finalizing a modification with Plaintiff.

67.     Thus, although no enforceable agreement evidences the modification Plaintiff was to receive in December 2024, Defendants are in breach of an implied in fact contract by failing to enter into a modification with Plaintiff.

68.     The parties' intentions and actions are sufficiently clear that Plaintiff qualified for a loan modification and Defendants have refused to finalize a modification with Plaintiff.  This is a breach of and/or an anticipatory repudiation of Defendants' contractual obligations.

69.     As a result of the breach, Plaintiff has suffered actual and consequential damages of at least $100,000.00, including but not limited to, the loss of the Property and the equity thereto.

70.     It has been necessary for Plaintiff to retain counsel in order to file this lawsuit, and as a result, Plaintiff is entitled to its costs and reasonable attorneys' fees.

///

///

## SECOND CLAIM FOR RELIEF

### (Breach of Covenant of Good Faith and Fair Dealing – Against Defendants)

71.     Plaintiff repeats, re-alleges, and incorporates herein by reference the allegations set forth in the preceding paragraphs.

72.     Defendants have breached the implied covenant of good faith and fair dealing by failing to perform its contractual obligations to Plaintiff by following through with a modification of the Loan after Plaintiff qualified for such.

73.     As a result of this unreasonable refusal to perform, Plaintiff's justified expectations in obtaining a modification were denied.

74.     Further, Plaintiff is informed and believes and thereon alleges Defendants' failure to effectuate a loan modification is in conscious disregard for the rights of Plaintiff and/or in reckless disregard for the consequences of its actions.

75.     As a result of Defendants' conduct and failure to act in good faith, Plaintiff is entitled to general and/or special damages in excess of $100,000.00.

76.     It has been necessary for Plaintiff to retain counsel in order to file this lawsuit, and as a result, Plaintiff is entitled to its costs and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF

### (Negligent Misrepresentation – Against UHM)

77.     Plaintiff repeats, re-alleges, and incorporates herein by reference the allegations set forth in the preceding paragraphs.

78.     As detailed in the paragraphs above, between December 2024 and May 2025, Plaintiff was in constant communication with Amber Edmonson at UHM to obtain a modification after he qualified for a modification.

79.     As detailed in the paragraphs above, during this approximate six month period Amber made multiple false representations to Plaintiff regarding the modification.

80.     Plaintiff is informed and believes that UHM, through its employees and/or agents, at a bare minimal failed to exercise reasonable care or competence in engaging in these communications with Plaintiff.

81.    Given Defendant is a large financial institution that lends hundreds of thousands of dollars to American citizens (such as the Loan herein), Plaintiff reasonably and justifiably relied on UHM's continued misrepresentations that he would be given a modification after qualifying for one.

82.    As a result of this reliance on UHM's misrepresentations, Plaintiff is now in risk of losing his home because the current servicer (SN Servicing) and/or owner of the Loan (U.S. Bank) reuse to acknowledge that a modification exists.

83.    Instead, SN Servicing and/or U.S. Bank and their agents /assigns are attempting to foreclose on the Property.

84.    As a result, Plaintiff has been damaged in an amount in excess of $100,000.00.

85.    It has been necessary for Plaintiff to retain counsel in order to file this lawsuit, and as a result, Plaintiff is entitled to its costs and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

### (Promissory Estoppel – Against UHM)

86.    Plaintiff repeats, re-alleges, and incorporates herein by reference the allegations set forth in the preceding paragraphs.

87.    As set forth in detail above, since December 2024 UHM has promised Plaintiff a modification would be provided to him.

88.    In making these representations, UHM thereby induced Plaintiff to enter into a modification and yet refuses to provide him with a modification.

89.    Plaintiff was unaware that these multiple representations made by UHM were untrue.

90.    As detailed herein, Plaintiff reasonably and justifiably relied on UHM's collective and continued misrepresentations that a modification would be granted to him.

91.    Now, after UHM released the servicing of the Loan to SN Servicing, SN Servicing and/or U.S. Bank and their agents /assigns assert that a modification does not exist and are attempting to foreclose on the Property.

92.    As a result of UHM's clear promise to Plaintiff and failure to perform said promise, Plaintiff has suffered out of pocket and expectation damages in excess of $100,000.00.

93.    It has been necessary for Plaintiff to retain counsel in order to file this lawsuit, and as

a result, Plaintiff is entitled to its costs and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF

### (Injunctive Relief-Against all Defendants)

94. Plaintiff repeats, re-alleges, and incorporates herein by reference the allegations set forth in the preceding paragraphs.

95. On December 15, 2025, SN servicing and/or U.S. Bank, through their agents, recorded a Notice of Default on the Property.

96. Plaintiff is informed and believes that Defendants may attempt to further dispose of the Property during the course of this litigation.

97. Plaintiff has no adequate remedy at law if Defendants foreclose on the Property before the claims set forth herein are adjudicated.

98. Plaintiff will face immediate, permanent and irreparable harm if injunctive relief is not provided to prevent the foreclosure from occurring during the pendency of this litigation.

99. Under the circumstances pled herein, balancing the equities favors an injunction in Plaintiff's favor.

100. Plaintiff has a reasonable likelihood of succeeding on the merits in this case.

101. Accordingly, Plaintiff seeks a temporary restraining order, preliminary injunction or permanent injunction enjoining Defendants from selling, disposing or otherwise hypothecating the Property during the pendency of this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For the first through fourth claims for relief, actual, consequential, special and other damages in excess of $100,000.00 and/or to be proven at the time of trial;

2. For the fifth claim for relief, that injunctive relief, either by temporary restraining order, preliminary or permanent injunction relief be issued to preclude Defendants from selling, disposing or otherwise hypothecating the Property at issue herein during the pendency of this lawsuit

3. Reasonable attorney's fees and costs according to contract and/or applicable law;

# EXHIBIT "1"

# EXHIBIT "1"

LOAN #: 645623
MIN: 1000745-0000721226-7

# NOTE

December 30, 2020
[Date]

Strongsville,
[City]

Ohio
[State]

4701 E Savoy Blvd, Pahrump, NV 89061
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. **$348,000.00** (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Union Home Mortgage Corp., a Corporation.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **3.500 %.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**
I will pay principal and interest by making a payment every month.

I will make my monthly payment on the **1st** day of each month beginning on **August 1, 2021.** I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **July 1, 2051,** I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **8241 Dow Circle W**
**Strongsville, OH 44136**

or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**
My monthly payment will be in the amount of U.S. **$1,562.68.**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any

Initials: 

LOAN #: 645623

sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which

Initials: 

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3200 1/01
Ellie Mae, Inc.                                            Page 2 of 3
F3200NOT  0107
F3200NOT (CLS)
12/30/2020 12:27 PM PST

LOAN #: 645623

Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.
**THE PROVISIONS CONTAINED IN THE "CONSTRUCTION/PERMANENT LOAN ADDENDUM TO NOTE", SIGNED BY ALL BORROWERS NAMED HEREIN, ARE HEREBY INCORPORATED INTO AND SHALL AMEND AND SUPPLEMENT THIS NOTE.**

_____ (Seal)
DAKOTA DELANCE

**Lender: Union Home Mortgage Corp.**
**NMLS ID: 2229**
**Loan Originator: Flint Theobald**
**NMLS ID: 1843033**

[Sign Original Only]
Initials: 

F3200NOT  0107
F3200NOT (CLS)
12/30/2020 12:27 PM PST

LOAN #: 645623
MIN: 1000745-0000721226-7

# CONSTRUCTION/PERMANENT LOAN
# ADDENDUM TO NOTE

THIS CONSTRUCTION LOAN ADDENDUM (this "Addendum") is made on     **December 30, 2020**     and is incorporated into and shall be deemed to amend and supplement that certain promissory note made by the undersigned Borrower (referred to herein as "I", "me", "my") to evidence my indebtedness (the "Loan") to **Union Home Mortgage Corp., a Corporation**

and its successors and assigns (the "Lender") and dated the same date as this Addendum (the "Note"). The Note is secured by a security instrument, as amended by a Construction Loan Rider, in favor of the Lender dated the same date as this Addendum (the "Security Instrument"). All terms defined in the Note shall have the same meaning in this Addendum.

IN ADDITION TO THE COVENANTS AND AGREEMENTS MADE IN THE NOTE, I further covenant and agree as follows:

**1.   CONSTRUCTION/PERMANENT LOAN.** The Note, as amended by this Addendum, is for a combined construction mortgage loan and permanent mortgage loan. During the Construction Loan Phase, the Lender will advance funds in accordance with the Construction Loan Agreement between the Lender and me dated the same date as this Addendum (the "Construction Loan Agreement"). The "Construction Loan Phase" is the period beginning on the date of this Addendum and continuing until the first day of the month following the date for completion of construction (the "Completion Date"), specified in the Construction Loan Agreement. The "Permanent Loan Phase" is the period beginning on the first day of the month following the Completion Date. On the first day of the month following the Completion Date (the "Permanent Mortgage Date"), the Loan will become a permanent mortgage loan. The Permanent Mortgage Date for my Loan is **July 1, 2021.**     My first payment of principal and interest during the Permanent Loan Phase will be due on the **first**     day of the second month following the Completion Date which is     **August 1, 2021** as provided in Section 3(A) of the Note. The Maturity Date for the Loan is **July 1, 2051.**

**2.   INTEREST AND PAYMENTS.**

**(A) Construction Loan Phase Interest Rate.** During the Construction Loan Phase, I will pay interest only on the amount of the Loan proceeds the Lender disburses under the Construction Loan Agreement (each, an "Advance"). I will pay interest at a yearly rate of **3.500 %.**     The interest rate required by this Section 2(A) is the rate I will pay both before and after any default.

**(B) Interest Only Payments.** Interest on Advances shall be calculated from the date each Advance is made and shall continue to accrue until the full amount of Principal has been paid. My Construction Loan Phase interest payments will be:

☒ Due and payable on the  **1st**  day of the month following the month in which the interest accrued, or

☐ Paid directly from the "Interest Reserve Account" established at the time of closing in the amount reflected in the Draw Schedule attached as Exhibit D to the Construction Loan Agreement.

Construction Loan Phase interest will be advanced by the Lender from the Interest Reserve Account on the first day of the month following the month in which the interest is billed, and Construction Loan Phase interest advanced will be added to the Principal. I will pay interest on all of the Principal, including Advances from the Interest Reserve Account. In the event that the Interest Reserve Account is depleted prior to the Completion Date, I agree to pay directly to the Lender from my own funds any and all interest owed during the Construction Loan Phase. The Lender shall pay no interest on the Interest Reserve Account.

**(C) Permanent Loan Phase Interest Rate.** During the Permanent Loan Phase, I will pay interest at the rate stated in Section 2 of the Note ("Note Rate").

**(D) Principal Prepayments; Permanent Phase Interest and Principal Payments.** Any portion of a payment the Lender receives in excess of the interest due during the Construction Loan Phase or any funds the Lender does not advance under the Construction Loan Agreement may, at the Lender's option, be used to pay costs associated with the Construction Loan Phase or may be credited as a partial prepayment of the Principal amount of the Loan. The partial prepayment will reduce either the ☐ amount or the ☐ number of my monthly payments. Beginning on the Permanent Mortgage Date, principal and interest will be due and payable as set forth in the Note.

**(E) Interest Rate Limits.** Notwithstanding anything to the contrary, in no event shall interest charged under this Note exceed the maximum rate allowed by applicable law.

**3.   NOTICE OF NO ORAL AGREEMENT.** The Note, this Addendum, the Construction Loan Agreement, the Security Instrument and the Construction Loan Rider to Security Instrument represent the final agreement between the parties regarding the Loan and may not be contradicted by evidence of any prior, contemporaneous, or subsequent oral agreement of the parties. I hereby acknowledge and confirm that there are no oral agreements between the Lender and me regarding the Loan.

Multistate – Construction/Permanent Loan Addendum to Note
Ellie Mae, Inc.                                                            Page 1 of 2

Initials: _____

GCNSTPFADN   0617
GCNSTPFADN (CLS)
12/30/2020 12:27 PM PST

LOAN #: 645623

BY SIGNING BELOW, I accept and agree to the terms and covenants contained in this Addendum.

_____(Seal)
**DAKOTA DELANCE**

Initials: _____
GCNSTPFADN   0817
GCNSTPFADN (CLS)
12/30/2020 12:27 PM PST

# EXHIBIT "2"

# EXHIBIT "2"

# DOC #945849

Official Records Nye County NV
Deborah Beatty - Recorder
12/31/2020 02:49:49 PM
Requested By: FIDELITY NATIONAL TIT
Recorded By: tc  RPTT:$0
Recording Fee: $37.00
Non Conformity Fee: $
Page 1 of 21

APN: 045-293-10

When recorded, return to:
**Union Home Mortgage Corp.**
**Attn: Final Document Department**
**8241 Dow Circle W**
**Strongsville, OH 44136**

MAIL TAX STATEMENT TO:  **Union Home Mortgage Corp.**
**8241 Dow Circle W, Strongsville, OH 44136**

**APN #: 045-293-10**

**Title Order No.: 00109331**
**Escrow No.: 00109331**
**LOAN #: 645623**

———————————————— [Space Above This Line For Recording Data] ————————————————

## DEED OF TRUST

| MIN   1000745-0000721226-7 |
| --- |
| **MERS PHONE #: 1-888-679-6377** |

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document
are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated  **December 30, 2020,**
together with all Riders to this document.
**(B) "Borrower"** is  **DAKOTA DELANCE AND JESSICA DELANCE, HUSBAND AND WIFE.**

Borrower is the trustor under this Security Instrument.

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01
Ellie Mae, Inc.                                            Page 1 of 14

NVEDEDL  0315
NVEDEDL (CLS)
12/30/2020 12:27 PM PST

LOAN #: 645623

(C) "Lender" is   Union Home Mortgage Corp..

Lender is   a Corporation,                                                    organized and existing
under the laws of   Ohio.                                                     Lender's address is
8241 Dow Circle W, Strongsville, OH 44136.

(D) "Trustee" is  Fidelity National Title Agency of Nevado Inc..

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has
an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated   December 30, 2020.
The Note states that Borrower owes Lender   THREE HUNDRED FORTY EIGHT THOUSAND AND
NO/100* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *   Dollars
(U.S. $348,000.00             ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   July 1, 2051.
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider                    ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider       ☒ Other(s) [specify]
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider  Construction/Permanent Loan
☐ V.A. Rider                                                Rider to Security Instrument, .

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments
and other charges that are imposed on Borrower or the Property by a condominium association,
homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds
paid by any third party (other than insurance proceeds paid under the coverages described in Section
5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part
of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as
to, the value and/or condition of the Property.

NEVADA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01
Ellie Mae, Inc.                              Page 2 of 14                        NVEDEDL  0315
                                                                                NVEDEDL (CLS)
                                                                        12/30/2020 12:27 PM PST



**LOAN #: 645623**

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **County**
[Type of Recording Jurisdiction] of **Nye**                                    [Name of Recording Jurisdiction]:
**See attached legal description**
**APN #:  045-293-10**

which currently has the address of   **4701 E Savoy Blvd, Pahrump,**
                                                                                      [Street] [City]

Nevada **89061**                        ("Property Address"):
              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

NEVADA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01**
Ellie Mae, Inc.                                            Page 3 of 14                                  NVEDEDL   0315
                                                                                                                      NVEDEDL (CLS)
                                                                                                       12/30/2020 12:27 PM PST



**LOAN #: 645623**

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien

NEVADA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01**
Ellie Mae, Inc.                                       Page 4 of 14                          NVEDEDL   0315
                                                                                            NVEDEDL (CLS)
                                                                                            12/30/2020 12:27 PM PST



LOAN #: 645623

or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner

NEVADA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01**
Ellie Mae, Inc.                                                    Page 5 of 14

NVEDEDL  0315
NVEDEDL (CLS)
12/30/2020 12:27 PM PST



LOAN #: 645623

acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole



**LOAN #: 645623**

obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying

NEVADA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01**
Ellie Mae, Inc.

NVEDEDL 0315
NVEDEDL (CLS)
12/30/2020 12:27 PM PST



LOAN #: 645623

reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the note, another insurer, any reinsurer, any other entity, or affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement



LOAN #: 645623

provided that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's

NEVADA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3029 1/01
Ellie Mae, Inc.                                    Page 9 of 14

NVEDEDL  0315
NVEDEDL (CLS)
12/30/2020 12:27 PM PST



LOAN #: 645623

interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers

**NEVADA**--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01**
Ellie Mae, Inc.                              Page 10 of 14
                                              NVEDEDL  0315
                                              NVEDEDL (CLS)
                                              12/30/2020 12:27 PM PST



LOAN #: 645623

unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured



**LOAN #: 645623**

by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat



**LOAN #: 645623**

of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, and without further demand, may invoke the power of sale, including the right to accelerate full payment of the Note, and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute written notice of the occurrence of an event of default and of Lenders' election to cause the Property to be sold, and shall cause such notice to be recorded in each county in which any part of the Property is located. Lender shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Assumption Fee.** If there is an assumption of this loan, Lender may charge an assumption fee of U.S.

NEVADA--Single Family--**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3029 1/01
Ellie Mae, Inc.
Page 13 of 14
NVEDEDL  0315
NVEDEDL (CLS)
12/30/2020 12:27 PM PST



LOAN #: 645623

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____  Dakota Delance   12-30-2020 (Seal)
DAKOTA DELANCE                                        DATE

_____  Jessica Delance   12-30-20 (Seal)
JESSICA DELANCE                                      DATE

State of NEVADA
County of NYE

This instrument was acknowledged before me on DECEMBER 30, 2020 (date) by DAKOTA DELANCE AND JESSICA DELANCE (name(s) of person(s)).

(Seal, if any)

M. CHILDRESS
Notary Public, State of Nevada
Appointment No. 15-2894-14
My Appt. Expires Sep 4, 2023

_____
(Signature of notarial officer)

Title (and rank): Notary Public

Lender: Union Home Mortgage Corp.
NMLS ID: 2229
Loan Originator: Flint Theobald
NMLS ID: 1843033

NEVADA—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3029 1/01
Ellie Mae, Inc.                     Page 14 of 14                     NVEDEDL  0315
                                                                      NVEDEDL (CLS)
                                                                      12/30/2020 12:27 PM PST



Order No.: **00109331-019-LI3**

## EXHIBIT A

### LEGAL DESCRIPTION

LOT 399 OF GREEN SADDLE RANCH, AS SHOWN BY MAP THEREOF RECORDED MARCH 6, 1975 AS DOCUMENT NO. 46886 OF OFFICIAL RECORDS, NYE COUNTY, NEVADA.

Assessor's Parcel Number: 045-293-10



LOAN #: 645623
MIN: 1000745-0000721226-7

## CONSTRUCTION/PERMANENT LOAN
## RIDER TO SECURITY INSTRUMENT
## (INCLUDING SECURITY AGREEMENT)
(To be attached to and recorded with this Security Instrument)

THIS CONSTRUCTION LOAN RIDER TO SECURITY INSTRUMENT (this "Rider") is
made on     **December 30, 2020**     and shall be deemed to amend and supple-
ment the Mortgage, Deed of Trust or Security Deed of the same date, to which this Rider
is attached ("this Security Instrument"), given by the undersigned ("Borrower") for the
benefit of **Union Home Mortgage Corp., a Corporation**

("Lender") to secure Borrower's Note to Lender and the Construction Loan Addendum to
Note, both of the same date (collectively, the "Note") and covering the property described
in this Security Instrument (the "Property"). All terms defined in the Note and elsewhere
in this Security Instrument shall have the same meaning in this Rider.

IN ADDITION TO THE COVENANTS AND AGREEMENTS MADE IN THIS SECURITY
INSTRUMENT, Borrower and Lender further covenant and agree as follows:

**1. Construction Loan Agreement.** The Note evidences Borrower's promise to pay
Lender the aggregate amount of all advances made and distributed by Lender under
the terms and conditions of a Construction Loan Agreement between Lender and Bor-
rower dated the same date as the Note (the "Loan Agreement"). The Loan Agreement
provides for construction of certain improvements (the "Improvements") on the Property.

Multistate – Construction/Permanent Loan Rider to Security Instrument
Ellie Mae, Inc.                         Page 1 of 6                         GCNSTPRLU  0616
                                                                           GCNSTPRLU (CLS)
                                                                           12/30/2020 12:27 PM PST



**LOAN #: 645623** 

Borrower agrees to comply with the covenants and conditions of the Loan Agreement. This Security Instrument secures to Lender (a) the repayment of the debt evidenced by the Note, including the aggregate amount of all advances made by Lender from time to time under the terms of the Loan Agreement, with interest as provided in the Note, and all renewals, extensions, and modifications of the Note, (b) the performance of all of Borrower's covenants and agreements under the Note, this Security Instrument, the Loan Agreement and all other documents pertaining to the Loan (the "Loan Documents"), and (c) the payment of all other sums, with interest at the Note Rate, advanced by Lender to protect the security of this Security Instrument, or to perform any of Borrower's obligations under the Loan Documents. Upon the failure of Borrower to keep and perform all the covenants, conditions and agreements of the Loan Agreement, the Principal and all interest and other charges provided for in the Loan Documents and secured hereby shall, at the option of the Lender, and subject to any right of Borrower to cure Borrower's default, become immediately due and payable in full.

**2. Future Advances.** During the Construction Loan Phase, interest will accrue on the outstanding Principal according to the terms set forth in the Note. Provided there has been no default as defined in the Note, the Loan Agreement, or this Security Instrument, and provided Borrower has satisfied all conditions precedent required for an advance under the Loan Documents, Lender is legally obligated to make advances of principal upon application therefor by Borrower in accordance with the provisions of the Note and the Loan Agreement up to a maximum principal amount (including present and future obligations), which is equal to the amount of the Note as set forth in this Security Instrument. Such advances shall be evidenced by the Note, made under the terms of the Loan Agreement and secured by this Security Instrument and may occur for a period up to the end of the Construction Loan Phase, but in no event after

**6**      months from the date of this Rider.

**3. Assignment of Rights or Claims.** From time to time as Lender deems necessary to protect Lender's interest, Borrower shall, upon request of Lender, execute, acknowledge before a notary public, and deliver to Lender, assignments of any and all rights or claims which relate to the construction on the Property.

Multistate – Construction/Permanent Loan Rider to Security Instrument
Ellie Mae, Inc.                                    Page 2 of 6

GCNSTPRLU  0616
GCNSTPRLU (CLS)
12/30/2020 12:27 PM PST





**LOAN #: 645623**

**4. Breach by Borrower.** In case of breach by Borrower of the covenants and conditions of the Loan Agreement, subject to any right of Borrower to cure Borrower's default, Lender, at Lender's option, with or without entry upon the Property (a) may invoke any of the rights or remedies provided in the Loan Agreement, (b) may accelerate the sums secured by this Security Instrument and invoke any of the remedies provided in this Security Instrument, or (c) may do both. Lender's failure to exercise any of its rights and remedies at any one time shall not constitute a waiver by Lender of its right to exercise that right or remedy, or any other right or remedy, in the future.

**5. Permanent Mortgage Date.** On the day the Construction Loan Phase ends, the loan evidenced by the Note will become a permanent mortgage loan (the "Permanent Mortgage Date"). Beginning on the Permanent Mortgage Date, interest shall accrue as stated in the Note and monthly payments of principal and interest shall be due and payable as set forth in the Note.

**6. Occupancy.** Section 6 of this Security Instrument is amended and restated to read as follows: Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the Permanent Mortgage Date and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Security Agreement and Financing Statement.**

**a.** The property covered by this Security Instrument includes the Property previously described or referred to in this Security Instrument, together with the following, all of which are referred to as the "Property." The portion of the Property that constitutes real property is sometimes referred to as the "Real Property." The portion of the Property which constitutes personal property is sometimes referred to as the "Personal Property," and is described as follows: (i) Borrower's right to possession of the Property; (ii) any and all fixtures, machinery, equipment, building materials, appliances, and goods of every

Multistate – Construction/Permanent Loan Rider to Security Instrument
Ellie Mae, Inc.                                    Page 3 of 6



**LOAN #: 645623**

nature whatsoever now or hereafter located in, or on, or used, or intended to be used in connection with the Property or the Improvements, and all replacements of and accessions to those goods; and (iii) proceeds and products of the Personal Property. Despite any other provision of this Rider or any other Loan Document, however, Lender is not granted, and will not have, a non-purchase money security interest in household goods, to the extent that such a security interest would be prohibited by applicable law.

**b.** This Security Instrument is and shall be a security agreement granting Lender a first and prior security interest in all of Borrower's right, title and interest in and to the Personal Property, under and within the meaning of applicable state laws, as well as a document granting a lien upon and against the Real Property. In the event of any foreclosure sale, whether made by Trustee, or under judgment of a court, or otherwise, all of the Real Property and Personal Property may, at the option of Lender, be sold as a whole or in parcels. It shall not be necessary to have present at the place of such sale the Personal Property or any part thereof. Lender, as well as Trustee on Lender's behalf, shall have all the rights, remedies and recourse with respect to the Personal Property afforded to a "Secured Party" by applicable state laws in addition to and not in limitation of the other rights and remedies afforded Lender and/or Trustee under this Security Instrument. To the extent permitted by applicable law, Borrower shall, upon demand, pay to Lender the amount of any and all expenses, including the fees and disbursements of Lender's legal counsel and of any experts and agents, which Lender may incur in connection with: (i) the making and/or administration of this Security Instrument; (ii) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon any Property, real and/or personal, described in this Security Instrument; (iii) the exercise or enforcement of any of the rights of Lender under this Security Instrument; or (iv) the failure by Borrower to perform or observe any of the provisions or covenants in this Security Instrument.

**c.** Lender may, at its election, at any time after the delivery of this Security Instrument, sign one or more copies of this Security Instrument in order that such copies may be used as a financing statement under applicable state laws. Lender's signature need not be acknowledged, and is not necessary to the effectiveness hereof as a deed of trust, a security agreement, or (unless otherwise required by applicable state laws) a financing statement.



**LOAN #: 645623**

**d.** Borrower also authorizes Lender to sign and file, without Borrower's signature, such financing and continuation statements, amendments, and supplements thereto, and other documents that Lender may from time to time deem necessary to perfect, preserve and protect Lender's security interest in the Property. If any other documents are necessary to protect Lender's interest in the Property, Borrower agrees to sign these documents whenever Lender asks. Borrower also gives Lender permission to sign these documents for Borrower.

**8. Invalid Provisions.** If any one or more of the provisions of this Security Instrument, or the applicability of any such provision to a specific situation, shall be held invalid or unenforceable, such provision shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and the validity and enforceability of all other provisions of this Security Instrument and all other applications of any such provision shall not be affected thereby.

**9. Addresses.**
The name and address of the Borrower is:
**Dakota Delance**
**10414 Beallsville St**
**Las Vegas, NV 89141**

The name and address of the Lender/Secured Party is:
**Union Home Mortgage Corp., a Corporation**
**8241 Dow Circle W**
**Strongsville, OH 44136**

Multistate – Construction/Permanent Loan Rider to Security Instrument
Ellie Mae, Inc.                                     Page 5 of 6                                     GCNSTPRLU  0616
                                                                                                    GCNSTPRLU (CLS)
                                                                                                    12/30/2020 12:27 PM PST



**LOAN #: 645623**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants con-
tained in this Rider.



DAKOTA DELANCE    DaKota Delance                    /2-30-2020 (Seal)
                                                              DATE

JESSICA DELANCE    Jessica Delance                   12-30-20 (Seal)
                                                              DATE

ATTENTION COUNTY CLERK. This instrument covers goods that are or are to become fixtures
on the Property described herein and is to be filed for record in the records where Security
Instruments on real estate are recorded. Additionally, this instrument should be appropriately
indexed, not only as a Security Instrument but also as a financing statement covering goods
that are or are to become fixtures on the Property described herein. The mailing address of the
Borrower (Debtor) and Lender (Secured Party) are set forth in this Security Instrument.

Multistate – Construction/Permanent Loan Rider to Security Instrument
Ellie Mae, Inc.                    Page 6 of 6                    GCNSTPRLU  0616
                                                                 GCNSTPRLU (CLS)
                                                                 12/30/2020 12:27 PM PST



# EXHIBIT "3"

# EXHIBIT "3"

DOC # 970712
Official Records Nye County Nevada
Deborah Beatty — Recorder
12/07/2021 01:11:12 PM
Requested By: UNION HOME MTGE
Recorded By: kd      RPTT:$0
Recording Fee:   $37.00
Page 1 of 5

After Recording Return To:
Union Home Mortgage
8241 Dow Circle W
Strongsville, OH 44136
APN 045-293-10

[Space Above This Line For Recording Data]

## CONSTRUCTION CONVERSION MODIFICATION AGREEMENT

| | |
|---|---|
| Lenders Loan Number: 645623 | |
| MIN:100074500007212267 | MERS Phone: 1-888-679-6377 |

(Fixed Interest Rate)

**TWO ORIGINAL MODIFICATION AGREEMENTS MUST BE EXECUTED BY THE BORROWER: ONE ORIGINAL IS TO BE FILED WITH THE NOTE AND ONE ORIGINAL IS TO BE RECORDED IN THE LAND RECORDS WHERE THE SECURITY INSTRUMENT IS RECORDED.**

This Construction Conversion Modification Agreement (the "Agreement"), made and effective, October 25, 2021 between Union Home Mortgage Corp.("Lender") and Dakota Delance & Jessica Delance ("Borrowers"), Mortgage Electronic Registration Systems, Inc., ("Mortgagee") modifies and amends certain terms of Borrower's indebtedness evidenced by (1) the interim construction financing fixed interest rate Note (the "Fixed Rate Note") to Lender dated 12/30/2020 in the original principal sum of U.S. 348,000.00 and secured by (2) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") and Rider(s), if any, with Mortgage Electronic Registration Systems, Inc., as mortgagee of record, solely as nominee for Lender and Lender's successors and assigns, dated the same date as the Fixed Rate Note and recorded on December 31, 2020 as Doc #945849 of the Nye County Records [Name of Records] of Nye County, Nevada [County and State, or other Jurisdiction]. The Security Instrument covers the real and personal property described in the Security Instrument and defined as the "Property", located at:

4701 E Savoy Blvd, Pahrump, NV, 89061
[Property Address]

the real property described being set forth as follows: See Exhibit "A"

Borrower and Lender agree that on or before the date of this Agreement the construction of the Property has been completed and that all loan proceeds have been disbursed to Borrower in accordance with the terms of the Fixed Rate Note. Borrower and Lender have agreed to modify the terms of the Fixed Rate Note and Security Instrument in accordance with the terms of this Agreement. This Agreement is not a novation.

In consideration of the mutual promises and agreements exchanged, Lender and Borrower agree as follows (notwithstanding anything to the contrary contained in the Fixed Rate Note and Security Instrument):

1. Current Loan Balance. As of 10/25/2021, the amount payable under the Fixed Rate Note and Security Instrument, each as modified by this Agreement (the "Unpaid Principal Balance"), is U.S. 348,000.00

   Interest, if any, has been paid through the date of this Agreement.

2. Note Modification. The terms and provisions of the interim construction financing stated in the Fixed Rate Note in Paragraphs 2 and 3, are amended and modified as follows:

a.   Interest. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the unpaid principal until the full amount of the Unpaid Principal Balance has been paid. Borrower must pay interest at a yearly rate of 3.500. This interest rate shall apply both before and after any default described in the Fixed Rate Note.

b.   Payments. Borrower promises to make monthly payments in the amount of U.S. 1,562.68.

Borrower shall pay principal and interest by making a payment every month. Borrower shall make the monthly payment of the 1st day of each month beginning on 12/01/2021. Borrower shall make these payments every month until Borrower has paid all of the principal and interest and any other charges described in the Fixed Rate Note. The monthly payments shall be applied as stated in the Fixed Rate Note.

If on 11/01/2051, Borrower still owes amounts under the Fixed Rate Note and the Security Instrument, each as amended by this Agreement, Borrower will pay those amounts in full on the Maturity Date.

Borrower must make the monthly payments at the place stated in the Fixed Rate Note or such other place as Lender may require.

c.   Other Terms Remain in Effect. Other terms, including, without limitation, terms related to Borrower's right to prepay, loan charges, late charges and default, obligations of persons under the Note and payment in full in the event of a sale or transfer of property, that are stated in the Fixed Rate Note remain in full force and effect.

d.   Compliance with Covenants. Borrower shall comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument.

3.   Amendments to the Security Instrument. The terms and provisions of the interim construction financing stated in the Security Instrument are amended and modified as follows: [those marked are applicable]

[ ] a.   Increase in Principal Balance. The Unpaid Principal Balance of the Note that is secured by this Security Instrument has been increased by U.S. $_____ _____.

[ ] b.   Decrease in Principal Balance. The Unpaid Principal Balance of the Note that is secured by this Security Instrument has been decreased by U.S. $__ _____ _____.

[x] c.   Change in Maturity Date. The Unpaid Principal Balance if not paid sooner is due in full not later than 11/01/2051.

[x] d.   Security Instrument Riders Cancelled. The rider(s) of the Security Instrument pertaining to the interim construction financing are null and void and of no further effect as of the date of this Agreement.

[ ] e.   Additional Security Instrument Rider(s). The terms and conditions of the Security Instrument are further amended and modified by the terms and conditions stated in the Security Instrument Rider(s), dated the date of this Agreement, fully executed and delivered by Borrower, and attached to and incorporated into this Agreement by reference.

4. <u>Recordation</u>. This Agreement shall be recorded, together with any applicable attachments, in all places where the Security Instrument is recorded.

5. <u>No Release</u>. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Fixed Rate Note or Security Instrument. Except where otherwise specifically provided in this Agreement, the Fixed Rate Note and Security Instrument shall remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions of these instruments, as amended by this Agreement.

In Witness Whereof, Lender and Borrower have executed this Agreement.
Mortgage Electronic Registration Systems, Inc., solely as nominee for Union Home Mortgage, its successors and assigns

By: _____  11/17/21
                     Date

                                            Dakota Delance      11-15-2021
                                                    Date

By: _____
Mortgage Electronic Registration Systems, Inc. - Mortgagee    Jessica Delance      11-15-21
                                                      Date

Its: _____ Asst. Secretary

Acknowledgments of all parties executing this agreement follow.

## ACKNOWLEDGMENT OF BORROWER(S)

STATE OF __NEVADA__ )           COUNTY OF __NYE__ )

ON __NOVEMBER 15__ , 2021 before me, the undersigned Notary Public, personally appeared __DAKOTA DELANCE and JESSICA DELANCE__ and acknowledged that he/she/they executed the same for the purposes expressed therein. I attest that the principal(s) appear(s) to be of sound mind and not under or subject to duress, fraud or undue influence.

Notary resides in _____ NYE _____ County, Commission Expiration Date __9/4/2023__

__N. Childress__
NOTARY PUBLIC PRINTED

_____
NOTARY PUBLIC SIGNATURE

N. CHILDRESS
Notary Public, State of Nevada
Appointment No. 15-2894-14
My Appt. Expires Sep 4, 2023

_____              _____
WITNESS                                    WITNESS

## ACKNOWLEDGMENT OF LENDER

STATE OF Ohio )

COUNTY OF Cuyahoga )

On November 17, 2021 before me, the undersigned Notary Public, personally appeared Scott Schade as Assistant Secretary ; Mortgage Electronic Registration Systems, Inc., solely as nominee for Union Home Mortgage, it successors and assigns OR Mortgage Electronic Registration Systems, Inc., solely as nominee for Union Home Mortgage, its successors and assigns, for and on behalf of the company, and acknowledged that he/she executed the same for the purposes expressed therein. I attest that the principal appears to be of sound mind and not under or subject to duress, fraud or undue influence.

Notary resides in Cuyahoga County.

Commission Expiration Date 6/20/2026

Beth A. Goist
NOTARY PUBLIC PRINTED

Beth A. Goist
NOTARY PUBLIC SIGNATURE

BETH A GOIST
Notary Public, State of Ohio
My Commission Expires:
June 20, 2026

Document Prepared by: Union Home Mortgage

[Attached Any Applicable Security Instruments Riders]

Unofficial Copy

Order No.: **00109331-019-L13**

## EXHIBIT A

## LEGAL DESCRIPTION



LOT 399 OF GREEN SADDLE RANCH, AS SHOWN BY MAP THEREOF RECORDED MARCH 6, 1975 AS DOCUMENT NO. **46886** OF OFFICIAL RECORDS, NYE COUNTY, NEVADA.

Assessor's Parcel Number: 045-293-10

Unofficial Copy

# EXHIBIT "4"

# EXHIBIT "4"



26th  DAY OF MARCH, 2025

DAKOTA  DELANCE
4701  E SAVOY BLVD                                    Property Address:  4701  E SAVOY BLVD
PAHRUMP, NV 89061

Loan Number: 0137676508

Dear DAKOTA  DELANCE,

**Congratulations, you are eligible for a Loan Modification, which will permanently change the terms of your mortgage**! If you comply with the terms of the required Trial Period Plan, we will modify your mortgage and may waive all prior late charges that remain unpaid.

The enclosed modification agreement ("Loan Modification Agreement") reflects the proposed terms of your modified mortgage.  Your new principal and interest payment beginning FEBRUARY 1, 2025 will be $1,414.86 based on an interest rate of 3.5% having an amortization period of 480 months.  Your <u>estimated</u> escrow payment will be $702.27 per month which includes $332.67 for real estate taxes, $69.33 for hazard insurance, and $1.67 for escrow shortage.  Your new <u>estimated</u> total monthly payment amount is $2,117.13.

**To Accept This Offer:**

☑ **Sign and return** both copies of the Loan Modification Agreement back to us in the enclosed, pre-paid envelope **04/16/2025.**  If you do not send both signed copies of the Loan Modification Agreement by the above date, you must contact us if you still wish to be considered for a modification.

- **You must sign both copies before a notary public and return the notarized copies to us.**
- We encourage you to make a copy of all documents for your records.

☑ **Make all remaining trial period payments** on or before the dates they are due. If the trial period payments are made after their due dates or in amounts different from the trial period payment amount required, your mortgage may not be able to be modified. **Any trial payments received after  must be in the form of certified funds or will be returned.**

To better understand the proposed terms of your modified mortgage, please read the attached summary of your modified mortgage and the Loan Modification Agreement.

Don't delay—take advantage of this great offer **04/16/2025**.


Respectfully,


Amber Edmonson
Loss Mitigation Team Lead

*Attachments: Summary of Your Modified Mortgage, Two copies of the Loan Modification Agreement*

If you believe there is an error, or if you need additional information related to the servicing of your mortgage loan, you must send a written Notice of Error or Request for Information to our designated address; Union Home Mortgage Corp., Attn: NOE/RFI, 14843 Sprague Road, Ste H, Strongsville, OH 44136. Your Notice of Error or Request for Information must include your name, loan number and sufficient detail to inform us of the basis of your request.

| SUMMARY | Here is a summary of your modified mortgage. |
|---------|----------------------------------------------|

**NEW/UNPAID PRINCIPAL BALANCE**.  Any past due amounts as of the end of the trial period, including unpaid interest, real estate taxes, insurance premiums, and certain assessments paid on your behalf to a third party, will be added to your mortgage loan balance.  In addition, your mortgage insurance premium may increase as a result of the higher mortgage loan balance.  **If you fulfill the terms of the trial period including, but not limited to, making any remaining trial period payments, we will waive ALL late charges that have accrued and remain unpaid at the end of the trial period.**

**INTEREST RATE**.  The interest rate on your modified loan will be adjusted as noted in the attached Loan Modification Agreement in Section 2.

**TERM EXTENSION**.  To reduce your mortgage payment, we may extend the term of your mortgage. If so, this means we will spread your payments over a longer period.

**ESCROW ACCOUNT**.  The terms of your Loan Modification Agreement require that you pay into an escrow account an amount sufficient to cover your property taxes, insurance premiums and other required fees. Any prior waiver of escrows by your lender is no longer in effect. *Union Home Mortgage Corp.* will draw on this account to pay your real estate taxes and insurance premiums as they come due. Please note that your escrow payment amount will adjust if your taxes, insurance premiums and/or assessment amounts change, so the amount of your monthly payment that *Union Home Mortgage Corp.* must place in escrow will also adjust as permitted by law. This means that your monthly payment may change.

**PAYMENT TERMS**.  The enclosed Loan Modification Agreement includes your monthly principal and interest payment amount in Section 2 showing your payment for the life of your modified loan after the trial period.

**FEES**.  There are no fees or other charges for this modification.

**LOAN MODIFICATION AGREEMENT**.  Please read the enclosed Loan Modification Agreement carefully and make sure that you understand it.  If you have any questions, please contact us at (440) 534-2695.

_____[Space Above This Line For Recording Data]_____

# LOAN MODIFICATION AGREEMENT
**(Providing for Fixed Interest Rate)**

**Parcel Tax ID#: 04529310**  **MIN Number: 100074500007212267**
**Loan Number   0137676508**  **MERS Ph# 888-679-6377**
**PMI CASE # 1463940**

This Loan Modification Agreement ("Agreement"), made this **26th DAY OF MARCH, 2025**, between **DAKOTA DELANCE AND JESSICA DELANCE, HUSBAND AND WIFE** ("Borrower" – the term Borrower excludes someone signing the loan modification agreement for purposes of releasing dower.) and **UNION HOME MORTGAGE CORP.** ("Lender"), Mortgage Electronic Registration Systems, Inc, ("Mortgagee") amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") dated **DECEMBER 30, 2020** and granted or assigned to Mortgage Electronic Registration Systems, Inc, as mortgagee of record (solely as nominee for Lender and Lender's successors and assigns) P.O. Box 2026, Flint, Michigan 48501-2026 and recorded on **DECEMBER 31, 2020 INSTRUMENT  NO. 945849**, of the Official Records of **NYE COUNTY,  NEVADA** and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

**4701  E SAVOY BLVD, PAHRUMP,  NEVADA  89061**

the real property described being set forth as follows:

**LEGAL DESCRIPTION/SEE  ATTACHED  LEGAL**

In consideration of  the  mutual  promises  and  agreements  exchanged,  the  parties  hereto  agree  as  follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. As of **FEBRUARY  1, 2025**, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. $**365,226.66**, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2. Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender.   Interest will be charged on the Unpaid Principal Balance at the yearly rate of **3.500%**, from **JANUARY 1, 2025**. Borrower promises to make monthly payments of principal and interest of U.S. $**1,414.86**, beginning on the 1st day of **FEBRUARY,  2025**, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full.   The yearly rate of **3.500%** will  remain in effect until principal and interest are paid in full.  If on **JANUARY  1, 2065** (the "Maturity Date"), Borrower still  owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower  will  pay these amounts in full on the Maturity Date.

3. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration.   The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument.   If Borrower  fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

4. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items,  impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following  terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:
   (a)     All terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating  to, any change or adjustment in the rate of interest payable under the Note; and

(b)     All terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

5.     Borrower understands and agrees that:

(a)     All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b)     All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law.  Also, except as provide herein all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.  If borrower has filed for relief under the United States Bankruptcy Code and will not reaffirm the debt evidenced by the Note and Security Instrument, or if borrower has received a discharge under the United States Bankruptcy Code and did not reaffirm the debt evidenced by the Note and Security Instrument, this agreement is a voluntary modification of payment terms for the purpose of preventing foreclosure. It is not an attempt to collect a debt. Borrower will not have personal liability for this debt without a reaffirmation agreement that meets the specific requirements of 11 USC  524.

(c)     Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d)     All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e)     Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(f)     Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

By checking this box, Borrower also consents to being contacted by text messaging ☐ .

BY: _____
**ASSISTANT SECRETARY OF
MERS AS NOMINEE FOR
UNION HOME MORTGAGE CORP.,**    -Lender
**ITS SUCCESSORS AND OR ASSIGNS**

_____
**Printed Name**

_____ **[Space Below This Line For Acknowledgments]** _____

**STATE OF    OHIO
COUNTY OF**                                    } **SS**

**The foregoing instrument was acknowledged before me this ____ day of _____ , 20__**

**by _____,ASSISTANT SECRETARY, MERS AS NOMINEE FOR UNION HOME
MORTGAGE CORP., ITS SUCCESSORS AND OR ASSIGNS.**
      (person acknowledging)

|  |  |
|---|---|
| **NOTARY SEAL** | _____ <br> **NOTARY SIGNATURE** <br> *(Printed Name)* _____ <br><br> Notary Public,        County, **OHIO** <br><br> **My Commission Expires: _____** |

**UNION HOME MORTGAGE CORP.**

**LOAN MODIFICATION AGREEMENT**—Single Family MERS                    *(page 3 of 6)*

BY:_____

_____
**Printed Name**

TITLE: _____

_____
**Date of Lenders Signature**

**STATE OF       OHIO**
**COUNTY OF**

**The foregoing instrument was acknowledged before me this ____ day of _____ , 20__**

**By: _____, _____ OF**

**UNION HOME MORTGAGE CORP.**

| | |
|---|---|
| **NOTARY SEAL** | _____<br>**NOTARY SIGNATURE**<br>_____<br>*(Printed Name)*<br><br>Notary Public,            County, **OHIO**<br><br>**My Commission Expires:  _____** |

_____          _____
**DAKOTA  DELANCE** - Borrower               **JESSICA DELANCE**- Co-Mortgagor

_____ [Space Below This Line For Acknowledgments] _____

**STATE OF**    NEVADA
**COUNTY OF**   _____               **}** **SS**

        The foregoing instrument was acknowledged before me this _____ day of _____ , 20__

by **DAKOTA  DELANCE  AND JESSICA DELANCE,  HUSBAND  AND  WIFE**
        (person acknowledging)

| NOTARY  SEAL | _____ |
| --- | --- |
|  | **NOTARY  SIGNATURE** |
|  | _____ |
|  | *(Printed Name)* |
|  | Notary Public,  _____ County, _____ |
|  | **My Commission Expires:** _____ |

LOAN MODIFICATION AGREEMENT—Single Family—UNIFORM INSTRUMENT              Form 3179   1/01 (rev. 4/14)   *(page 5 of 6)*
**Record and Return To: Amber Edmonson**          **Prepared By: Amber Edmonson**
Union Home Mortgage Corp.                Union Home Mortgage Corp.
14843 Sprague Road, Ste I                14843 Sprague Road, Ste I
Strongsville, OH 44136                   Strongsville, OH 44136

*I affirm, under the penalties for perjury, that I have taken reasonable care to redact each Social Security number in this document, unless required by law, Amber Edmonson*

## EXHIBIT A

## LEGAL DESCRIPTION

LOT 399 OF GREEN SADDLE RANCH, AS SHOWN BY MAP THEREOF RECORDED MARCH 6, 1975 AS DOCUMENT NO. 46886 OF OFFICIAL RECORDS, NYE COUNTY, NEVADA.

Assessor's Parcel Number: 045-293-10